**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: 2:16-CV-14162-ROSENBERG/MAYNARD**

JAMES P. CROCKER,

Plaintiff,

v.

DEPUTY SHERIFF STEVEN ERIC BEATTY, et al.,

Defendants.
_____________________________/

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT BEATTY AND GRANTING MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT SNYDER**

Plaintiff James Crocker saw an upside-down car on Interstate 95 and pulled over. Emergency personnel arrived on scene. At some point, Mr. Crocker began photographing the scene on his cellular phone. Defendant Steven Beatty, a Deputy Sheriff, seized Crocker's phone and also arrested Plaintiff for resisting an officer without violence when Plaintiff refused to leave the scene without his phone. This case arises out of the seizure of Plaintiff's person and phone. The Amended Complaint contains claims against Defendant Beatty in his individual capacity and against Sheriff William Snyder in his official capacity as Sheriff of Martin County.[1] Both Defendants moved for summary judgment. The motions are now ripe. The Court has considered all relevant filings and the argument heard in this matter on June 29, 2017. Defendant Beatty's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART** and Defendant Snyder's Motion for Summary Judgment is **GRANTED**.

[1] The Amended Complaint also contains claims against former Martin County Sheriff Robert Crowder in his individual capacity. Sheriff Crowder moved for summary judgment. DE 145. However, Plaintiff voluntarily dismissed the claims against Sheriff Crowder with prejudice following the hearing on June 29, 2017, pursuant to Federal Rule of Civil Procedure 41. *See* DE 171.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48). A fact is material if "it would affect the outcome of the suit under the governing law." *Id.* (citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving

party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party. *See Shiver*, 549 F.3d at 1343.

## II. BACKGROUND[2]

On May 20, 2012, Plaintiff James Crocker left Palm Beach Gardens traveling northbound on Interstate 95. DE 151-1 at 51:25; 52:1-3. Plaintiff observed an overturned vehicle in the median he believed had recently been involved in a car accident. *Id.* at 52:5-16. The accident scene was at mile marker 89, DE 151-4 at ¶ 3, where Interstate 95 is three lanes wide in both directions, DE 151-1 at 53:6-7; DE 151-4 at ¶ 3. The northbound and southbound lanes are separated by a grass median with no guard rail. DE 151-1 at 52:23-25, 53:1-3; DE 151-4 at ¶ 3.

The overturned vehicle had been traveling northbound when its right rear tire "separated" and the driver lost control. DE 155-1. The vehicle veered off the road and onto the median, flipping over. *Id.* The vehicle came to rest on its roof in the portion of the median nearest to the southbound lanes, as shown:

[2] The facts are largely undisputed, but where there is a conflict the Court has so noted.

Plaintiff pulled over on the left shoulder of the northbound lanes, out of the lane of travel. DE 151-1 at 53:3-5; 54:4-6. After stopping his own car, Plaintiff ran to the overturned vehicle on the median which, as noted above, had come to rest in the portion of the median nearest to the southbound lanes of Interstate 95. *Id.* at 54:19-25. He was accompanied by ten or fifteen other people who also had pulled over to assist. *Id.* at 55:5-13. A road ranger arrived on scene shortly thereafter and assured the group that emergency personnel were en route. *Id.* at 59:24-25; 60:22-25. Plaintiff walked back to the other side of the median—the side nearest the northbound lanes of Interstate 95—to wait. *Id.* at 62:7-11.

Plaintiff was standing near the western edge of the northbound lanes approximately forty to fifty feet away from the overturned vehicle, DE 151-1 at 63:8-10, and approximately one hundred and twenty-five feet north of his own vehicle, *id.* at 62:19-25. He was in the median approximately ten feet off of the paved break-down lane. *Id.* at 63:1-7. Plaintiff remained in this location until his arrest, *id.*, which also occurred at mile marker 89, DE 151-8. Plaintiff could not recall whether he was standing north or south of the overturned vehicle. DE 151-1 at 62:19-22.

There is a dispute about where, exactly, Plaintiff pulled over. Defendant Beatty's Statement of Material Facts alleges Plaintiff pulled over at mile marker 91. *See* DE 152. In support, Defendant Beatty cites a "Release of Responsibility Form" stating Plaintiff's vehicle was towed from "I-95 NB @ 91 Mile Marker." DE 151-9 at 1. However, Defendant does not dispute that Plaintiff was standing approximately forty to fifty feet from the overturned vehicle at mile marker 89, DE 151-1 at 63:8-10, and approximately one hundred and twenty-five feet north of his parked vehicle, *id.* at 62:23-25. This conflicts with Defendant's assertion that Plaintiff pulled over at mile marker 91. Plaintiff could not have been one hundred and twenty-five feet

north of a car parked at mile marker 91 and, simultaneously, within forty to fifty feet of the overturned vehicle at mile marker 89.

Plaintiff looked to his left and observed other people taking pictures. DE 151-1 at 73:4-7. Plaintiff began photographing the overall scene, which included empty beer bottles, the overturned vehicle, and firemen. *Id.* at 73:16-19; *see also id.* at 74:25-25; 75:1. He could not see any of the persons involved in the accident. *Id.* at 73:13-15. Five to seven other bystanders were also taking pictures at the time. *Id.* at 75:24-25. The group on the median was spread out over an area of forty to fifty feet. *Id.* at 76:4-9.

The Florida Highway Patrol ("FHP") arrived on scene at 13:56:47. DE 151-5. Within minutes, FHP requested assistance from the Martin County Sheriff's Office ("MCSO"). *Id.* Defendant Beatty arrived on scene at 14:07:47. DE 151-5 at 3. Plaintiff had been taking pictures for less than thirty seconds when he first encountered Defendant Beatty. DE 151-1 at 75:16-22. Plaintiff first noticed Defendant Beatty when he was about four or five feet away and in the process of approaching Plaintiff. *Id.* at 77:3-7. Defendant Beatty's uniform immediately alerted Plaintiff that Defendant Beatty was an MCSO officer. *Id.* at 77:8-18.

Here, Defendant Beatty's account and Plaintiff's diverge. According to Defendant Beatty, the facts are as follows: Defendant Beatty approached Plaintiff and asked who he was, to which Plaintiff responded that he had arrived after the crash. DE 151-4 at ¶ 7. Defendant Beatty then took Plaintiff's phone. Plaintiff asked Defendant Beatty if photographing the crash scene was illegal, to which Defendant Beatty responded that the photographs on the phone were evidence because the crash involved a potential fatality. *Id.*

According to Plaintiff, events unfolded differently: Defendant Beatty grabbed Plaintiff's phone from his hand "without warning or explanation." DE 157-5 at ¶ 19. Defendant Beatty did

not say anything to Plaintiff before taking his phone. *Id.* at ¶ 20. Only after taking Plaintiff's phone did Defendant Beatty ask what Plaintiff was doing at the scene. *Id.* at ¶ 22. Plaintiff asked if it was illegal to photograph the scene, to which Defendant Beatty responded, "[N]o, but now your phone is evidence of the State." *Id.* at ¶ 24.

At this point, the parties' accounts come back together. Defendant Beatty told Plaintiff to leave the scene, drive to a northbound weigh station, and wait. DE 151-4 at ¶ 8. The weigh station was about a mile away on the northbound side of Interstate 95. DE 151-1 at 82:4-8. Plaintiff offered to delete the pictures in an effort to resolve the situation. *Id.* at 80:19-23. Defendant Beatty again told Plaintiff to leave the area, go to the northbound weigh station, and wait. *Id.* at 82:19-21. He advised Plaintiff that his phone would be turned over to an FHP investigator who would contact him concerning its disposition. DE 151-4 at ¶ 10.

Plaintiff asked Defendant Beatty for his name, which Defendant Beatty provided. DE 151-1 at 82:22-23. Plaintiff insisted that he deserved to be treated with dignity and respect, having been a law abiding citizen for over twenty years. *Id.* at 82:23-25; 83:1. Defendant Beatty told Plaintiff to turn around because he was under arrest. *Id.* at 83:1-2. When Plaintiff asked what he was being arrested for, Defendant Beatty responded that Plaintiff was being arrested for resisting an officer. *Id.* at 83:2-3. Plaintiff then told Defendant Beatty he would be happy to leave, but not without his phone. *Id.* at 83:3-4. Defendant Beatty asked Plaintiff to put his hands behind his back. *Id.* at 88:20-24. Plaintiff complied and was placed under arrest. *Id.*

Defendant Beatty testified to calling the arrest in to dispatch when it was made. DE 154-5 at 14-16. Defendant Beatty's affidavit also reflects that he notified dispatch shortly after Plaintiff was handcuffed: "I handcuffed the Plaintiff behind his back and notified dispatch that I had placed him under arrest, which is reflected in the CAD Report under the main call number

12121553 at 14:21:45 at 'Beatty w/m 10-15.'" DE 151-4 at ¶ 11. The entire interaction—from the time Plaintiff first saw Defendant Beatty until Plaintiff was in handcuffs—lasted between sixty and ninety seconds. *Id.* at 83:7-8.

There is a conflict about when Plaintiff's phone was taken. Defendant Beatty argues in his Reply that Plaintiff's phone was taken at 14:15:00, citing the "Initial Property/Evidence Receipt." *See* DE 151-7. This document was completed after-the-fact while Plaintiff was seated in Defendant Beatty's patrol car. DE 151-4 at ¶ 11. Even assuming the interaction between Plaintiff and Defendant Beatty lasted only sixty seconds, the phone would have been seized by Defendant Beatty at approximately 14:20:45—one minute before Defendant Beatty notified dispatch after arresting Plaintiff, not at 14:15:00.

After handcuffing Plaintiff, Defendant Beatty walked Plaintiff to the patrol car, which was parked on the east shoulder of Interstate 95, facing south. DE 151-1 at 89:5-12. During the walk, Plaintiff told Defendant Beatty he had taken the pictures to show his daughter. *Id.* at 84:12-16; DE 151-4 at ¶ 12. Plaintiff also told Defendant Beatty that he has been personal friends with Sheriff Snyder for over twenty years, that he employs over one hundred people in the town, and that he had never broken the law. DE 151-1 at 83:16-25; 84:1-3.[3] Defendant Beatty told Plaintiff he did not care who Plaintiff knew or how many people he employed—he was going to jail. *Id.* at 84:4-9. Defendant Beatty then used one hand to squeeze Plaintiff's shoulder area on a pressure point. *Id.* at 91:5-25.[4] Simultaneously, Defendant Beatty reached down and tightened Plaintiff's handcuffs. *Id.* at 92:3-11.[5] The walk across the median took approximately thirty seconds. DE 151-4 at ¶ 12.

[3] Defendant Beatty testified that this conversation occurred before Plaintiff was handcuffed.
[4] Defendant Beatty testified this never occurred.
[5] Defendant Beatty testified this never occurred.

Plaintiff testified that when Defendant Beatty applied the pressure point, Plaintiff's knees buckled because of the severe pain. DE 151-1 at 92:24-25, 93:1-4; DE 57-5 at ¶ 39. Plaintiff also testified that the substantial tightening of the handcuffs caused "excruciating pain." DE 57-5 at ¶ 39. However, Plaintiff never mentioned to Defendant Beatty that he was in pain. *Id.* at 95:6-10. He also recalled that, following the incident, there were no signs of a physical injury—*e.g.* bruises, scrapes, or cuts. *Id.* at 93:8-12. Plaintiff never discussed the arrest with his doctors. *Id.* at 3-13.

Plaintiff was placed in the back of Defendant Beatty's patrol car. Defendant Beatty leaned in and turned the air-conditioning down or off.[6] Defendant Beatty then left. When he returned, Plaintiff begged for air. DE 151-1 at 101:11-19. Plaintiff was hot and uncomfortable; but he did not lose consciousness and he could breathe. *Id.* at 101:20-25; 102:1-8. Defendant Beatty responded that it was not meant to be comfortable and left again. Historical weather data, of which the Court takes judicial notice, reveals the temperature in the area on the afternoon of May 20, 2012, was approximately eighty-four degrees. *See* "Local Climatological Data: Hourly Observations on May 20, 2012," U.S. Dep't of Commerce Nat'l Oceanic & Atmospheric Admin. (accessed July 25, 2017).

Plaintiff testified that he was in the hot patrol car for more than thirty minutes. DE 156-1 at ¶ 41. As noted above, Defendant Beatty arrested Plaintiff at 14:21:45 and then took an approximately thirty-second walk to the patrol car. Defendant Beatty notified dispatch again when he left the scene to transport Plaintiff to jail, as shown on CAD report call number 12121591 at 14:43:47 as "Beatty in route to CJ." But based on the CAD reports, Plaintiff was in

---

[6] Defendant Beatty denied that he turned the air conditioning down or off.

the hot patrol car for approximately twenty-two minutes. Defendant Beatty turned the air conditioning on before beginning the drive to the county jail. DE 156-1 at ¶¶ 44-45.

Finally, there is conflicting evidence about when the LifeStar helicopter landed at the scene of the accident. It is undisputed that the helicopter ultimately landed at mile marker 91. Defendant Beatty asserts that he asked Plaintiff to leave the area, in part, because he believed the helicopter needed to land in the area where Plaintiff was standing. DE 151-4 at ¶ 8. In his Reply, Defendant Beatty argues the helicopter did not land until 14:57:29, citing the following notation in the CAD report: "671 REQX70 APPROACH AWAY FROM MEDIANREF FUEL LEAK." DE 151-3 at 7. However, that is inconsistent with Defendant Beatty's Affidavit, which states: "I placed Plaintiff in the rear of my patrol vehicle where he waited for a few minutes while the helicopter landed." DE 151-4 at ¶ 11. Defendant Beatty testified to leaving the scene at 14:43:47—approximately fifteen minutes before 14:57:29.

Plaintiff points to evidence that the helicopter landed before his arrest. Plaintiff testified that although he thought the helicopter was on the ground before his arrest, he was not certain. However, the argument finds support in notations in the CAD report, including: 4:19:37 "CHOPPER LANDING PER 1439." DE 151-3 at 7. This is consistent with the Incident Report completed by Martin County Fire Rescue, which states that the helicopter arrived at 14:21:00 and departed at 14:29:00. DE 157-3 at 16. Indeed the Incident Report reflects that the helicopter had arrived at the chosen destination—St. Mary's Hospital—by 14:40:00. *Id.*

## III. ANALYSIS

### A. Motion for Summary Judgment by Deputy Sheriff Beatty.

#### i. 42 U.S.C. § 1983 Claims Against Deputy Sheriff Beatty.

The § 1983 claims against Defendant Beatty are grounded in a plethora of constitutional provisions including the First, Fourth, Eighth, and Fourteenth Amendments. The seizure of Plaintiff's phone allegedly violated his First Amendment right to record police activity and his Fourth Amendment right to freedom from unreasonable searches and seizures. Plaintiff alleges the seizure of his person—his arrest—also violated his Fourth Amendment right to freedom from unreasonable searches and seizures. Finally, Plaintiff alleges that two acts amounted to excessive force: (i) Defendant Beatty's use of a pressure point and tightening of Plaintiff's handcuffs and (ii) the time spent in Defendant Beatty's hot patrol car. The Amended Complaint mentioned the Fourth, Eighth, and Fourteenth Amendments in connection with Plaintiff's excessive force claims. But, during the hearing, Plaintiff's counsel clarified that he is traveling under only the Fourteenth Amendment.[7] Defendant Beatty—who is being sued solely in his individual capacity—argues he is entitled to qualified immunity on each of Plaintiff's constitutional claims.

"In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). "[A] government official proves that he acted within his discretionary authority by

---

[7] "The Court: 'The excessive force claim of detention in a hot patrol car is being brought under the Fourteenth Amendment?' Mr. Rubin: 'Yes' . . . . The Court: 'And with respect to—under which constitutional amendment are you bringing the excessive force claim of the squeezing of the Plaintiff's shoulder and the tightening of his handcuffs?' Mr. Rubin: 'Same answer, Your Honor.'" Hrng. Trans. 29-30.

showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (internal quotation marks omitted). It is undisputed that Defendant Beatty was acting within his discretionary authority. *See* DE 156 at 4 ("With no dispute as to Beatty's discretionary authority . . . .").

Once the defendant has established that he was acting in his discretionary authority, the burden shifts to plaintiff. *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) (per curiam). "One inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. If the facts, construed . . . in the light most favorable to the plaintiff, show that a constitutional right has been violated, another inquiry is whether the right violated was 'clearly established.'" *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010) (internal citations omitted). For an official to lose qualified immunity, the plaintiff must show both that a constitutional violation occurred, *and* that the violation was of a clearly established right. *See id.* "[T]his two-pronged analysis may be done in whatever order is deemed most appropriate for the case." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

**1. First Amendment Claim.**

The Eleventh Circuit recognizes a First Amendment right to record police activity, subject to reasonable time, place, and manner restrictions. *Smith v. Cumming*, 212 F.3d 1332 (11th Cir. 2000). Defendant Beatty allegedly violated this right by seizing Plaintiff's phone while Plaintiff was photographing the accident scene. Defendant Beatty asserts qualified immunity. To overcome qualified immunity, Plaintiff must show Defendant Beatty violated a constitutional right that was clearly established when the alleged violation occurred. The Court can address the two prongs of the qualified immunity analysis in any order.

The Court exercises its discretion to address, first, whether the right at issue was clearly established when the alleged violation occurred. Qualified immunity protects government officials performing discretionary functions from civil liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). No case law specifically articulates a right to record police activity at the evolving scene of a crash from the median of a major highway. But Plaintiff can show the law was clearly established in three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; *or* (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (citations omitted) (emphasis added). *Smith* contains a broad statement of principle clearly establishing a constitutional right applicable to the novel facts of this case—namely, the First Amendment right to photograph police activity. *See Bacon v. McKeithen*, No. 14-cv-37, 2014 WL 12479640 at *4 (N.D. Fla. Apr. 28, 2014) (finding, in the context of an officer being recorded without his consent at a traffic stop, that "the holding in *Smith* dictates that its broad, clearly established principle should control the novel facts in this situation.") (internal quotation, citation omitted).

However, the First Amendment right to record police activity is subject to reasonable time, place, and manner restrictions. The Court must, therefore, determine whether it was clearly established when the alleged violation occurred that Plaintiff was photographing police activity in a reasonable time, place, and manner. There is no case law fleshing out what does (or does not) constitute a reasonable time, place, and manner in the context of photographing police

activity. The broad statement of principle that only reasonable restrictions are acceptable is little help. Reasonableness is, the Supreme Court has recognized, "a factbound morass." *Scott v. Harris*, 550 U.S. 372 (2007). Notice that the right to photograph police officers is subject to "reasonable" restrictions tells officers nothing about whether restricting recording in this particular context would (or would not) be reasonable. As the Eleventh Circuit has acknowledged, the "'clearly established' standard demands that a bright line be crossed. The line is not found in abstractions—to act reasonably, to act with probable cause, and so on—but in studying how these abstractions have been applied in concrete circumstances." *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993). And the Court does not find, on these facts, that Defendant Beatty's conduct was "so egregious" that a constitutional right was clearly violated even in the total absence of case law. Having found qualified immunity applies, the Court need not address whether Plaintiff's First Amendment right was violated in this case.

**2. Fourth Amendment Claims.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." As noted above, Plaintiff has alleged two discrete violations of this constitutional right: the seizure of his phone and the seizure of his person. The Court turns, first, to the seizure of Plaintiff's phone.

**a. Seizure of Plaintiff's Phone.**

"Ordinarily, the seizure of personal property is per se unreasonable unless the seizure is pursuant to a warrant issued upon probable cause." *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007). But there are several exceptions, including the existence of exigent circumstances. Exigent circumstances may arise from a variety of situations: "[H]ot pursuit of a fleeing felon, or imminent destruction of evidence, or the need to prevent a suspect's escape, or

the risk of danger to the police or to other persons inside or outside the dwelling." *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (quotation and citation omitted). However, "[p]olice officers relying on this exception must demonstrate an objectively reasonable basis for deciding that immediate action is required." *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990).

Defendant argues there is no constitutional violation, citing his "belief that the photographs [on Plaintiff's phone] were evidence and would possibly be destroyed." DE 151 at 5. As an objective basis for his belief, Defendant notes Plaintiff's offer to delete the photographs. But that offer was made only *after* Plaintiff's phone had been seized. It could not, therefore, have served as the basis for an objectively reasonable belief that Defendant was justified in seizing Plaintiff's phone in the first place. Counsel also cites, as an alternative objective basis, general knowledge "that things can disappear, especially on a phone, once they are away from the scene, once they are no longer available." Hrng. Trans. 16:13-15. Taken to its logical conclusion, this argument would justify the seizure of any phone containing photographs or recordings of a potential crime scene— such a finding sweeps too broadly. Based on the record evidence and the required inferences at this stage of the matter, the Court finds Defendant's summary seizure of Plaintiff's phone violated Plaintiff's Fourth Amendment rights.

The Court must next analyze whether the relevant law was clearly established at the time of the seizure. It has been the law of this Circuit for over a decade that officers relying on the exigent circumstances exception must show that the facts would have lead a reasonable, experienced officer to believe the evidence might be destroyed before a warrant could be secured. *See Young*, 909 F.2d at 446. There is no evidence in the record to support an objectively reasonable belief that the destruction of the photographs was imminent. Plaintiff was photographing the accident scene when Defendant Beatty approached him and took his phone.

Nothing said or done by Plaintiff before the seizure provided any indication he intended to delete the photographs. Nor did Defendant Beatty make any inquiry about the photographs in an effort to determine whether they actually constituted evidence potentially relevant to the Florida Highway Patrol's investigation before seizing the phone. Taking the facts in the light most favorable to Plaintiff, *nothing* was said before the seizure. Therefore, Defendant Beatty is not entitled to qualified immunity on Plaintiff's claim that the summary seizure of his phone violated the Fourth Amendment.

**b. Seizure of Plaintiff's Person.**

Plaintiff also alleges his arrest violated the Fourth Amendment. An individual has a right under the Fourth Amendment to be free from unreasonable searches and seizures. An arrest is a seizure of the person. *California v. Hodari D.*, 449 U.S. 621, 624 (1991). The reasonableness of a warrantless arrest turns on whether the officer had probable cause. "A warrantless arrest without probable cause violates the Fourth Amendment and forms the basis for a section 1983 claim." *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996). For probable cause to exist, an arrest must be objectively reasonable under the totality of the circumstances. *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty.*, 956 F.2d 1112, 1119 (11th Cir. 1992). This standard is met when "the facts and circumstances within the officer's knowledge, and of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995).

Although an officer who arrests an individual without probable cause violates the Fourth Amendment, his error "does not inevitably remove the shield of qualified immunity." *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1137 (11th Cir. 2007). Even if the officer did not have actual

probable cause, the Court must apply the standard of "arguable probable cause," asking whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] *could have believed* that probable cause existed to arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002) (emphasis added, quotation marks omitted). This standard recognizes officers may make reasonable but mistaken judgments regarding probable cause. *Skop*, 485 F.3d at 1137. But it does not shield officers who unreasonably conclude that probable cause exists from liability. *Id.*

Whether Defendant Beatty had probable cause or arguable probable cause to arrest Plaintiff depends on the elements of the alleged crime, *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1333 (11th Cir. 2004), and on the operative facts, *Skop*, 485 F.3d at 1137-38. Defendant Beatty argues there are four crimes for which he had probable cause to arrest Plaintiff: resisting an officer without violence in violation of Florida Statute § 843.02; stopping, standing, or parking in a prohibited place in violation of Florida Statute § 316.1945; walking on a limited access facility in violation of Florida Statute § 316.130(18); and hindering or attempting to hinder a firefighter in performance of his duty in violation of Florida Statute § 806.10. Although Plaintiff was only charged with resisting an officer without violence, Defendant Beatty is shielded by qualified immunity if he had probable cause or arguable probable cause to arrest Plaintiff for *any* offense. *Bailey*, 956 F.2d at 1119 n.4.

Defendant Beatty had probable cause to arrest Plaintiff for a violation of Florida Statute § 316.1945(11), entitled "Stopping, standing, or parking prohibited in specific places." It prohibits stopping, standing, or parking:

> On the roadway or shoulder of a limited access facility, except as provided by regulation of the Department of Transportation, or on the paved portion of a connecting ramp; except that a vehicle which is disabled or in a condition improper to be driven as a result of mechanical failure or crash may be parked on

> such shoulder for a period not to exceed 6 hours. This provision is not applicable to a person stopping a vehicle to render aid to an injured person or assistance to a disabled vehicle in obedience to the directions of a law enforcement officer or to a person stopping a vehicle in compliance with applicable traffic laws.[8]

Under Florida law, a law enforcement officer may arrest a person without a warrant if "[a] violation of chapter 316 has been committed in the presence of the officer." Fla. Stat. § 901.15(5). It is undisputed that Plaintiff pulled over on the shoulder of the northbound lanes of Interstate 95, out of the lane of travel. He stopped his car and then went to the overturned car, which was on the median. There is no evidence that Plaintiff's car was located anywhere but the northbound shoulder of Interstate 95. Interstate 95 is a limited access facility.[9] Therefore, stopping and parking on the northbound shoulder is prohibited unless one of the exceptions provided in the statute applies. When Plaintiff first pulled over in an attempt to aid the occupants of the overturned vehicle, he would arguably have been covered by the exception for "a person stopping a vehicle to render aid to an injured person . . ." Fla. Stat. § 316.1945(11).

But none of the exceptions outlined above would have permitted Plaintiff to be parked on the shoulder of Interstate 95 at the time he encountered Defendant Beatty. When Defendant

---

[8] The citation to this specific statutory provision is provided for the first time in Defendant Beatty's Reply. However, the argument was not raised for the first time in Defendant's Reply. *See* Local Rule 7.1 ("[R]eply memorand[a] shall be strictly limited to rebuttal of matters raised in the memorandum in opposition[.]"). Rather, Defendant Beatty's Motion for Summary Judgment states, in the context of his argument from Florida Statute § 316.130(18) that "Plaintiff could have been cited and taken into custody for parking on the side of the road and remaining in the median after first responders arrived. Although his initial presence may have been permitted for purposes of rendering aid, once the first responders arrived Plaintiff could no longer legally remain." DE 151 at 6. Accordingly, this argument is properly before the Court.

[9] A limited access facility is defined as: "A street or highway especially designed for through traffic and over, from, or to which owners or occupants of abutting land or other persons have no right or easement, or only a limited right or easement, of access, light, air, or view by reason of the fact that their property abuts upon such limited access facility or for any other reason. Such highways or streets may be parkways from which trucks, buses, and other commercial vehicles are excluded or may be freeways open to use by all customary forms of street and highway traffic." Fla. Stat. § 316.003(33).

Beatty approached Plaintiff, Plaintiff was not "render[ing] aid to an injured person or assistance to a disabled vehicle in obedience with the directions of a law enforcement officer or to a person stopping a vehicle in compliance with applicable traffic laws." *Id.* Instead, Plaintiff was standing forty to fifty feet away from the accident scene (and one hundred and twenty-five feet north of his own vehicle) taking photographs. As noted above, the only evidence in the record indicates Plaintiff's vehicle was on the northbound shoulder. Therefore, Defendant Beatty had probable cause to arrest Plaintiff for violating Florida Statute § 316.1945(11). The existence of probable cause is a complete bar to Plaintiff's claim that his arrest violated the Fourth Amendment. *See Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998). Having concluded Defendant Beatty had probable cause to arrest Plaintiff for violating Florida Statute § 316.1945(11), the Court need not address whether there was probable cause to arrest Plaintiff violating the other statutes cited by Defendant.

**3. Fourteenth Amendment Claims.**

The standard for showing excessive force under the Fourteenth Amendment is more difficult to meet than the standard for showing excessive force under the Fourth Amendment. Plaintiff argues that two happenings amount to the application of excessive force in violation of the Fourteenth Amendment: (i) the tightening of his handcuffs and Defendant Beatty's use of a pressure point as well as (ii) Plaintiff's detention in a hot patrol car.

To establish a claim for excessive force, the plaintiff must show both that defendant acted with a malicious and sadistic purpose to inflict harm and that more than a de minimis injury resulted. *See Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002). To determine whether force was applied maliciously and sadistically, federal courts look to: (1) the extent of the injury; (2) the need for application of force; (3) the relationship between the need and the amount of

force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible individuals on the basis of the facts known to him. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999) (quoting *Whitley*, 475 U.S. at 320-21).

The qualified immunity inquiry usually involves two prongs. For claims of excessive force in violation of the Eighth or Fourteenth Amendments, however, a plaintiff can overcome a defense of qualified immunity by showing only the first prong, that his Eighth or Fourteenth Amendment rights have been violated. *Johnson v. Breeden,* 280 F.3d 1308, 1321–22 (11th Cir. 2002). The Eleventh Circuit created this rule because, for an excessive-force violation of the Eighth or Fourteenth Amendments, "the subjective element required to establish it is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution . . . ." *Id.*

**a. Tightening of Handcuffs and use of Pressure Point.**

The Court begins with the threshold inquiry: Whether the force used was more than de minimis. Plaintiff testified that when Defendant Beatty applied the pressure point, Plaintiff's knees buckled because of the severe pain. DE 151-1 at 92:24-25, 93:1-4; DE 57-5 at ¶ 39. Plaintiff also testified that the substantial tightening of the handcuffs caused "excruciating pain." DE 57-5 at ¶ 39. However, Plaintiff never mentioned to Defendant Beatty that he was in pain. *Id.* at 95:6-10. He also recalled that, following the incident, there were no signs of a physical injury—*e.g.* bruises, scrapes, or cuts. *Id.* at 93:8-12. Plaintiff did not ever discuss the arrest with his doctors. *Id.* at 3-13.

According to Plaintiff's expert Dr. Hussamy—who reviewed Plaintiff's medical records approximately four and a half years after the incident—Defendant Beatty's actions caused a

severe contusion to both of Plaintiff's wrists and the exacerbation of Plaintiff's carpal tunnel syndrome, which was pre-existing. DE 87-1. Dr. Hussamy opined that in the years following the arrest, the pain, numbness, and tingling in Plaintiff's hands has worsened; that Plaintiff's injury is permanent; and that Plaintiff may, eventually, need a second carpal tunnel release procedure. *Id.*[10]

While claims involving mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, the applicable standard is the same. Accordingly, decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996). In the Eighth Amendment context, the Eleventh Circuit found the force used in *Harris* was more than de minimis. 97 F.3d at 505-06 (11th Cir. 1996). There, a group of officers beat plaintiff. *Id.* During the beating, one individual defendant snapped plaintiff's head back with a towel, "mugged" or slapped him twice in the face, and harassed him with several racial epithets and other taunts. *Id.* Plaintiff claimed that some of these actions, particularly the kicking and use of the towel, caused or exacerbated the injuries to his back. *Id.* The Eleventh Circuit characterized its decision as a "close call." The facts here involve the use of less force than *Harris*. Ultimately, the Court cannot conclude that more than de minimis force was used.[11]

---

[10] Plaintiff had a carpal tunnel release procedure months before the incident at issue in this case. It did not provide him any relief. DE 87-1 at 4.

[11] Defendant urges the Court to credit analogies to cases like *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000); *Durruthy v. Pastor*, 351 F.3d 1080 (11th Cir. 2003); and *Rodriguez v. Farrell*, 280 F.3d 1341 (11th Cir. 2001) for the proposition that painful handcuffing is de minimis force. However, in all three of those cases, the force was used *during* an arrest. Here, Plaintiff had already been handcuffed.

It is true that, taking the facts in the light most favorable to Plaintiff, he had already been handcuffed and was compliant and walking across the median to the patrol car. There is a "basic legal principle [] that once the necessity for the application of force ceases, any continued use of harmful force *can* be a violation of the Eighth and Fourteenth Amendments . . ." *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) (emphasis added). However, the Court finds that, as matter of law, the injuries Plaintiff sustained and the force used in this case do not rise to the constitutionally cognizable level illustrated by cases like *Harris*. *See also Cotney v. Bowers*, No. 03-cv-1181, 2006 WL 2772775 at * 7 (N.D. Ala. Sept. 26, 2006) (declining to grant summary judgment on Fourteenth Amendment claim where Plaintiff shackled to the floor of his cell was kicked by officers). In the absence of a constitutionally cognizable injury, there is no Fourteenth Amendment violation. Defendant is entitled to summary judgment on Plaintiff's Fourteenth Amendment claim.

**b. Detention in Hot Patrol Car.**

Defendant Beatty handcuffed Plaintiff and notified dispatch Plaintiff had been placed under arrest, reflected in the CAD report at 14:21:45 as "Beatty w/m 10-15." Plaintiff and Defendant Beatty walked to the patrol car, which took between thirty seconds and one minute. Defendant Beatty notified dispatch again when he left the scene to transport Plaintiff to jail, shown on CAD report call number 12121591 at 14:43:47 as "Beatty in route to CJ." Plaintiff testified that he was in the hot patrol car for more than thirty minutes. But based on the CAD reports, Plaintiff was in the hot patrol car for a half an hour at most. Historical weather data, of which the Court takes judicial notice, reveals the temperature during the afternoon on May 20, 2012, was approximately eighty-four degrees.

In *Anderson v. Naples*, 501 F. App'x 910, 918 n.8 (11th Cir. 2012) the Court noted in *dicta* that plaintiff had not shown "the kind of extreme conduct that amounts to a Fourteenth Amendment violation." There, plaintiff—who was wearing a gorilla suit—was left in a patrol car with the windows up and the air conditioning off for thirty-two minutes (at most) on an afternoon when the high temperature was eighty-one degrees. *Id.* The officer had leaned in the car and turned the air conditioning off.

One arguable difference between these two cases is that the plaintiff in *Anderson* did not produce any evidence showing he was injured by his time in the hot patrol car. *Id.* Here, Plaintiff's counsel asserted during the hearing that Dr. Omar Hussamy—Plaintiff's expert—concluded that "Mr. Crocker's position in the car and that because he was struggling for air and understandably thrashing around" contributed to the exacerbation of Plaintiff's carpal tunnel syndrome. Hrng. Trans. 38:23-25; 39:1-2. But Dr. Hussamy did not so testify. On cross-examination he merely replied "Yes" when asked the hypothetical question: "[I]f a person was struggling to breathe and their hands are behind their back in a closed compartment in a squad car, *could* the struggle in trying to breathe and get air cause additional wrenching of the wrists?" DE 87-3 at 58:21-25; 59:1-2. This is not the equivalent of testimony that Plaintiff's struggle in the patrol car did, in fact, contribute to his injuries. The Court finds that, as in *Anderson*, Plaintiff's time in the hot patrol car does not rise to the level of a Fourteenth Amendment violation. Therefore, Defendant Beatty is entitled to summary judgment on this portion of Plaintiff's Fourteenth Amendment claim.

**ii. State Law False Arrest Claim Against Deputy Sheriff Beatty.**

As under federal law, the existence of probable cause bars a claim under Florida law for false arrest. *See Whittington v. Town of Surfside*, 490 F. Supp. 2d 1239, 1256 (S.D. Fla. June 6,

2007) (citing *Von Stein v. Brescher*, 904 F.2d 572, 584 n.19 (11th Cir. 1990)). As noted above, Defendant Beatty had both probable cause and arguable probable cause to arrest Plaintiff for violating Florida Statute § 316.1945(11). Defendant Beatty is, therefore, entitled to summary judgment on Plaintiff's state law false arrest claim.

**B. Motion for Summary Judgment by Sheriff William Snyder.**

**i. 42 U.S.C. § 1983 Claims Against Sheriff Snyder.**

Defendant Sheriff Snyder is being sued solely in his official capacity. Suing a municipal official is the functional equivalent of suing the municipality. *Owens v. Fulton Cty.*, 877 F.2d 947, 951 n.5 (11th Cir. 1989) ("For liability purposes, a suit against a public official in his official capacity is a suit against the local government entity he represents."). In a suit filed pursuant to 42 U.S.C. § 1983, a municipality cannot be held liable under a theory of *respondeat superior*. *See Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978). Instead, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. at 386).

Plaintiff seeks to hold the municipality liable for each of the constitutional violations allegedly committed by Defendant Beatty: A violation of the First Amendment right to record police activity grounded in the seizure of Plaintiff's phone; violations of the Fourth Amendment right to freedom from unreasonable searches and seizures grounded in the seizures of Plaintiff's phone and person, respectively; and use of excessive force in violation of the Fourteenth Amendment. Plaintiff's claims against the municipality are each being brought under three theories of municipal liability: the custom or policy theory, the failure to train theory, and the

ratification theory.[12] However, Defendant Snyder is entitled to summary judgment because Plaintiff has not satisfied his burden with regard to any of the alleged violations.

**1. First Amendment Claim.**

Plaintiff seeks to hold the municipality liable for Defendant Beatty's alleged violation of Plaintiff's right to record police activity subject to reasonable time, place, and manner restrictions. First, Plaintiff advances the "custom or policy" theory of municipal liability, which has three elements: "(i) that [plaintiff's] constitutional rights were violated; (ii) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (iii) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton*, 489 U.S. at 388). The Court assumes *arguendo* a violation of Plaintiff's First Amendment right to record police activity and turns to the second element—the existence of a policy or custom that constituted deliberate indifference to that right.

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality . . . A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997), *cert. denied*, 522 U.S. 1075 (1998). These requirements ensure a municipality will not be held liable "*solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691.

[12] The Amended Complaint is unclear about which of these three theories of municipal liability Plaintiff is asserting with regard to each alleged constitutional violation. And not all of these theories are colorably asserted with regard to each alleged constitutional violation in Plaintiff's Response in Opposition to Defendant Snyder's Motion for Summary Judgment. *See* DE 157. However, the Court will err on the side of caution and analyze each claim under each of the three theories of municipal liability in light of Plaintiff's counsel's comments at the hearing. *See* Hrng. Trans. 42-43.

"A municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' *if* the municipality tacitly authorizes these actions or displays deliberate indifference towards the police misconduct." *Brooks v. Scheib*, 813 F.3d 1191, 1193 (11th Cir. 1987). But there must be some evidence that the municipality was aware of past misconduct. *See id.* (reversing the district court's judgment for plaintiff, holding that "[q]uite simply, there [was] no evidence that city officials were aware of past police misconduct."). Plaintiff's claim that the municipality's failure to enact a policy regarding the First Amendment right to record police officers amounts to deliberate indifference rests solely on his personal experience. Indeed, Plaintiff's counsel recognized as much during the hearing.[13] The record contains testimony that citizens frequently videotape police encounters. *See, e.g.*, DE 150-6 at 1. But that is a far cry from evidence that the officers being videotaped had previously interfered with recording in violation of the bystanders' Fourth Amendment rights. And Captain Robert Seaman, a 30(b)(6) representative for the Martin County Sheriff's Office testified: "It is not an ongoing and regular occurrence where the phones, that I'm aware of, are taken." DE 150-4 at 12-15. Plaintiff has not provided evidence of a "policy or custom."

Plaintiff's Amended Complaint asserts a second theory of municipal liability: the failure to train theory. A municipality may be held liable for failure to train or supervise its employees, but only where "the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *City of*

[13] "The Court: 'Apart from Defendant Beatty's behavior in this case, is there any evidence that Sheriff Snyder was on actual or constructive notice that omissions in training or a lack of policies regarding citizens' rights to photograph first responders was causing constitutional violations like the one alleged in this case?' Mr. Rubin: 'No specific instances in the record, Your Honor.'" Hrng. Trans. 48:21-25; 49:1-3.

*Canton*, 489 U.S. at 389-91). Because a municipality will rarely have a written or oral policy of inadequately training or supervising employees, liability attaches "where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants such that the failure to train can properly be thought of as a city policy or custom . . ." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489-90 (11th Cir. 1997) (quoting *City of Canton*, 489 U.S. at 389) (internal quotation omitted). To show deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1351. The Eleventh Circuit has "repeatedly [ ] held that without notice of a need to train or supervise in a *particular area*, a municipality is not liable as a matter of law for any failure to train or supervise." *Id.*

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary'" to provide such notice; however, the Supreme Court has "hypothesized" that a municipality may also be held liable when a single incident is the "obvious" consequence of a failure to train or supervise. *Connick v. Thompson*, 563 U.S. 51, 61-63 (2011) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). In *City of Canton*, the Supreme Court presented, as a hypothetical example, the obvious need to train police officers on the constitutional limitations regarding deadly force when the city provides the officers with firearms and knows the officers will be required to arrest fleeing felons. 489 U.S. 378, 390 n.10 (1989).

As discussed above, Plaintiff has not provided evidence of a pattern of constitutional violations similar to that alleged here—*i.e.* the seizure of a device being used by a bystander to record police activity.[14] However, Plaintiff argues Defendant Snyder may nonetheless be held

[14] *See* fn. 12, *supra.*

liable because this incident was an obvious consequence of a failure to train Defendant Beatty on citizens' right to record police activity. Where a constitutional violation is a "plainly obvious consequence" of a failure to train and the situation in which the violation occurs is likely to recur, a municipality may be said to have been deliberately indifferent to the need. *See City of Canton*, 489 U.S. at 390 n.10.

The Supreme Court clarified in *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997): "In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Available guidance on the application of the single-incident variation of the failure-to-train theory is limited. It has never been applied by the Supreme Court or by the Eleventh Circuit. There is little doubt, particularly in modern times, that citizens recording police officers is a "recurring situation"—and there is ample support in the record for that conclusion. But the record does not support the conclusion that a violation of citizens' First Amendment rights is a "highly predictable" consequence of failing to equip officers with specific tools for handling that situation. *See, e.g.*, *Gold* 151 F.3d at 1352 (finding contentions that the municipality had failed to train officers regarding the disorderly conduct statute and responding to handcuff complaints fell "'far short of the kind of obvious need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city.'") (citing *City of Canton*, 489 U.S. at 396-97).

Third, and finally, Plaintiff asserts a ratification theory. The sole argument colorably advanced in Plaintiff's Response in Opposition to Defendant Snyder's Motion for Summary

Judgment is that the ratification theory applies because a custom not approved through official decision-making channels led to the alleged First Amendment violation and Defendant Snyder must have known about that custom. But, as the Court has explained, Plaintiff has failed to produce evidence of such a custom. During the hearing, Plaintiff's counsel also argued the municipality should be held liable on a ratification theory because the Sheriff knew about this particular incident and nonetheless "failed to implement any review of the incident." Hrng. Trans. 43:14-20. "[W]hen plaintiffs are relying not on a pattern of unconstitutional conduct, but on a single incident, they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory." *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1174 n.12 (11th Cir. 2001), *cert. granted, judgment vacated sub nom. Thomas v. Roberts*, 536 U.S. 953 (2002), *opinion reinstated*, 323 F.3d 950 (11th Cir. 2003). Only when "the authorized policymakers approve a subordinate's decision and the basis for it" have they "ratifi[ed]" that "decision." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). The Eleventh Circuit rejected the same argument being advanced by Plaintiff in *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) because "[t]he sheriff did not review any part of Miley's actions before they became final, much less approve the decision and the basis for it." (internal citations, quotations, and alterations omitted). Just so here. Defendant Snyder is entitled to summary judgment on Plaintiff's First Amendment claim.

### 2. Fourth Amendment Claims.

#### a. Seizure of Plaintiff's Phone.

Next, Plaintiff seeks to hold the municipality liable for the seizure of his phone. The Court, begins, again, with the "custom or policy" theory of municipal liability. Defendant Beatty

did violate Plaintiff's Fourth Amendment rights by seizing his phone. However, Plaintiff has not provided record support for the existence of a custom or policy that constituted deliberate indifference to that constitutional right. *See McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Again, Plaintiff argues that "[a] municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' *if* the municipality tacitly authorizes these actions or displays deliberate indifference towards the police misconduct." *Brooks v. Scheib*, 813 F.3d 1191, 1193 (11th Cir. 1987). But, as emphasized above, there must be some evidence that the municipality was aware of past misconduct. *See id.* (reversing the district court's judgment for plaintiff, holding that "[q]uite simply, there [was] no evidence that city officials were aware of past police misconduct."). Here, again, there is no record evidence that the municipality was aware of past instances of misconduct.

However, proof of a single incident of unconstitutional activity is sufficient to impose liability on the municipality if there is proof the incident was caused by an existing, unconstitutional municipal policy, which can be attributed to a municipal policymaker. As evidence of such a policy, Plaintiff presents the testimony of Captain Seaman and characterizes Captain Seaman as having testified: "[T]hat in Martin County deputies do not need to obtain warrants or consent before seizing personal property, even in the absence of exigent circumstances!" DE 148 at 12. However, much of Captain Seaman's testimony was more nuanced. For example: "We are trained to look at the circumstances . . . If at the moment [Defendant Beatty] believed that was directly related to the investigation and may be of benefit and need for the [] investigation . . . him taking possession of that at that moment I think *could* certainly be justified." DE 150-4:9-16. And it *could* be—provided that, on the facts, there was

some applicable exception to the general requirement of a warrant and probable cause (*e.g.* exigent circumstances).

Moreover, to the extent that Captain Seaman *did* testify to such an unwritten practice, his testimony nonetheless falls short of establishing the municipality's liability. Plaintiff can establish the municipality's liability by identifying either: (i) an officially promulgated policy or (ii) an unofficial custom or practice of the municipality shown through the repeated acts of a final policymaker. *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). There was no official policy of allowing officers to seize evidence he or she believed had evidentiary value. And even assuming Captain Seaman did testify that "unofficial custom or practice" of the Martin County Sheriff's Office allowed officers to seize any evidence he or she believed had evidentiary value that had been operating since 2008, his testimony does not link that "unofficial custom or practice" to the repeated acts of a final policymaker.

Plaintiff also argues the municipality should be held liable for failure to train Defendant Beatty. However, there is no record evidence of a pattern of constitutional violations similar to the seizure of Plaintiff's phone. When asked about the existence of such evidence, Plaintiff's counsel emphasized that Sheriff Crowder reviewed all Internal Affairs inquiries for irregularities, reasoning: "*If* the institution as a whole has this tacit policy to ignore the Constitution as it relates to exigent circumstances . . . and the Sheriff is reviewing all of these . . . it would be patently obvious to any law enforcement reviewer that this is taking place." Hrng. Trans. 49:10-23. That response begs the question. At the hearing, Plaintiff's counsel also contended that the single-incident variation of the failure to train theory is applicable. The record does not support the conclusion that a violation of citizens' Fourth Amendment rights is a "highly predictable"

consequence of failing to enact a policy specifically addressing securing a citizens' property without a warrant or consent.

**b. Seizure of Plaintiff's Person.**

Even when individual officers are entitled to qualified immunity, a municipality might still be liable if a plaintiff can demonstrate that the municipality had a policy or custom that led to a constitutional deprivation. *See Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978) ("[I]t is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."). However, the Court need make this inquiry only when a plaintiff has suffered a constitutional deprivation. *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986) (determining that the extent to which departmental regulations infringe on constitutional rights is irrelevant when no constitutional injury, in fact, occurred). As noted above, Defendant Beatty had not only arguable probable cause, but actual probable cause. Accordingly, there was no constitutional violation.

Even assuming the Court had found a Fourth Amendment violation, Plaintiff has not made a showing sufficient to establish municipal liability. The Court begins with the custom or policy theory of liability. There is no official policy approving the practice of making arrests without probable cause or a warrant. And, as Plaintiff's counsel acknowledged during the hearing, the record contains no evidence of a custom or tacit policy. *See* Hrng. Trans. 45:16-21. Plaintiff has not established a failure to train. Defendant Sheriff Snyder has produced policies on arrest procedure. *See* DE 144-1. Additionally, Captain Seaman's affidavit states that as a sworn certified law officer Defendant Beatty received instruction and completed situational training on arresting persons. DE 144-2 at ¶¶ 1-5. Plaintiff has cited no record evidence to the contrary. Finally, there is no record evidence supporting the ratification theory.

**3. Fourteenth Amendment Claims.**

Defendant Snyder argues he is also entitled to summary judgment on Plaintiff's Fourteenth Amendment claims. Notably, Plaintiff's Response in Opposition to Defendant Snyder's Motion for Summary Judgment contains no argument whatsoever on this point. But a party's failure to oppose a summary judgment motion does not generally absolve the district court of its responsibility to consider the merits of the motion. *See United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). Therefore, the Court will address the merits of Plaintiff's Fourteenth Amendment Claims against Sheriff Snyder.

As discussed in the portion of this Order addressed to Plaintiff's claims against Defendant Beatty, Plaintiff has not shown a violation of the Fourteenth Amendment. Therefore, the Court need not address Plaintiff's municipal liability argument. *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986) (determining that the extent to which departmental regulations infringe on constitutional rights is irrelevant when no constitutional injury, in fact, occurred).

Even assuming the Court had found a Fourteenth Amendment violation, Plaintiff has not made a showing sufficient to establish municipal liability. The Court begins, once again, with the custom or policy theory of liability. There is no official policy approving the use of excessive force on arrestees in custody. And, as Plaintiff's counsel acknowledged during the hearing, the record contains no evidence of a custom or tacit policy. *See* Hrng. Trans. 45:16-21. Plaintiff has not established a failure to train. Defendant Sheriff Snyder has produced policies prohibiting the use of excessive force. *See* DE 144-1. Additionally, Captain Seaman's affidavit states that as a sworn certified law officer Defendant Beatty received instruction and completed situational training regarding the use of force. DE 144-2 at ¶1-5. Plaintiff has cited no record evidence to the

contrary. Finally, there is no record evidence supporting the ratification theory. Defendant Snyder is entitled to summary judgment on Plaintiff's Fourteenth Amendment claims.

**4. Claims for Declaratory and Injunctive Relief.**

Plaintiff seeks a declaration that the MSCO has failed to consider and safeguard bystanders' First Amendment rights to record police and an injunction compelling the MCSO to enact constitutionally adequate policies aimed at protecting that right. The requirement that a civil rights plaintiff suing a municipality show that his or her injury was caused by a municipal "policy or custom" is equally applicable were prospective relief is sought. *See Los Angeles Cty. v. Humphries*, 562 U.S. 29, 31 (11th Cir. 2010). A municipality may be sued directly for declaratory or injunctive relief when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" and when constitutional deprivations result from "governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Monell*, 436 U.S. at 690–91. Here, as detailed above, Plaintiff has not established municipal liability under either of these theories with regard to any of his First Amendment claims. And, even if he had, the Court is skeptical that Plaintiff would have standing to pursue injunctive relief in light of the standard set forth in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), which requires a plaintiff seeking injunctive relief to show "a sufficient likelihood he will again be wronged in a similar way," absent which he "is no more entitled to an injunction than any other citizen." Therefore, Plaintiff is not entitled to the prospective relief he seeks.

## IV. CONCLUSION

For the reasons stated above, Defendant Sheriff Snyder's Motion for Summary Judgment is **GRANTED**. Defendant Beatty's Motion for Summary Judgment, on the other hand, is **GRANTED IN PART AND DENIED IN PART**. Defendant Beatty is entitled to summary judgment on all of Plaintiff's claims except for Plaintiff's Fourth Amendment claim arising out of the seizure of his phone, which is being brought under 42 U.S.C. § 1983.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 28th day of July 2017.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record